## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Robert Lomas, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. CV 08-418 TUC JMR |
| vs. | ) | |
| | ) | **ORDER** |
| Maxim Healthcare Services, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court is Defendant Maxim Healthcare Services, Inc.'s ("Maxim") Motion to Compel Responses to Deposition Questions (Doc. No. 30) and Plaintiff Robert Lomas' Motion to Remove Defense Counsel Due to Conflict of Interest (Doc. No. 33). Oral argument was heard on both matters on July 6, 2009. For the reasons set forth below, Plaintiff's Motion to Remove Defense Counsel Due to Conflict of Interest is **DENIED**. After the Court announced its ruling that no attorney-client relationship existed between Maxim and the law firm of Snell & Wilmer ("S&W"), Lomas withdrew his opposition to Maxim's Motion to Compel. Accordingly, Defendant's Motion to Compel Responses to Deposition Questions is **GRANTED**.

## I.   Factual and Procedural Background

Robert Lomas was an Account Manager for Maxim Healthcare Services from approximately 2001 through 2007. On August 15, 2003, Lomas locked his keys in his car while in Green Valley, Arizona on business. He called his friend, Luis Vellon, another

1

Maxim employee, to come and pick him up, and the two of them drove to Lomas' house to retrieve his spare set of keys. While there, they began drinking alcohol, and thereafter decided to go to a casino to gamble.

Lomas and Vellon drove back to Green Valley and picked up Lomas' car, at which point they drove to a nearby Safeway and purchased a bottle of Bacardi rum and began drinking in the parking lot. They then drove to Desert Diamond Casino and played poker for several hours, periodically going out to the parking lot to drink from the bottle of rum they purchased. Several hours later, at approximately 2:30 a.m., Lomas and Vellon left the casino together in separate vehicles. Driving along I-19 toward Tucson in the early morning hours of August 16, 2003, Lomas and Vellon began drag racing, speeding alongside each other at approximately 90 miles per hour. At some point during the drive, Lomas claims he slowed down while Vellon continued on. Vellon eventually caused a rear-end collision with a young woman, Cora French, who was rendered paraplegic. Coming upon the scene, Lomas saw Vellon's car on the side of the road and picked up Vellon, leaving the scene of the accident to continue toward Tucson.

During an initial interview with police after Vellon was arrested, Lomas lied about the facts and circumstances surrounding the incident, denying any drinking that night. Lomas lied again, without the assistance of counsel and without informing Maxim, during a May 2005 deposition related to French's personal injury lawsuit against Vellon and Maxim. (Whether Lomas and Vellon were drinking during the evening in question potentially bore on Maxim's liability under a *respondeat superior* theory.) Since then, Lomas has testified multiple times that his untruthful statements were motivated by a

2

desire to protect his friend Vellon, and had nothing to do with Maxim. On December 14, 2005, Lomas was deposed—and lied—again. Maxim was represented by attorney Sandy Rogers at the deposition. According to Lomas, Rogers told him "that he should not testify truthfully" and "that he would not be 'in any trouble' if he testified favorably to the Defendant Maxim even if such testimony was untruthful."[1] Rogers denies counseling Lomas to lie. Maxim terminated its relationship with Rogers in early 2006 and hired new counsel, Snell & Wilmer ("S&W"). Lomas was told by S&W to testify truthfully in his upcoming third deposition on December 19, 2006. Lomas heeded this advice. On March 29, 2007, Vellon also gave truthful testimony at his deposition concerning the incident. Lomas and Vellon were terminated from their employment with Maxim the very next day.

On March 28, 2008, Lomas sued Maxim in Pima County Superior Court, alleging wrongful discharge, intentional infliction of emotional distress, fraud, deceit, and misrepresentation. He claimed that Maxim terminated his employment in retaliation for his "refusal to perpetuate untruthful testimony that would potentially result in financial losses for the Defendant Maxim." On July 22, 2008, Maxim removed the action to this Court and filed its answer to Lomas' complaint on November 18, 2008. Maxim's answer also contained an indemnity counterclaim against Lomas for which an Entry of Default

---

[1] Rogers is currently defending a malpractice suit brought against her by Lomas in Pima County Superior Court before Judge Cornelio. On the basis of Rogers' admitted failure to provide Lomas with warnings pursuant to *Upjohn Co. v. U.S.*, 449 U.S. 383 (1981), Judge Cornelio ruled that an attorney-client relationship existed between Rogers and Lomas. An *Upjohn* warning is a disclaimer issued by a company's attorney to an employee of the company, in which the employee is advised that the attorney does not represent the employee, that the company is their client, that the company controls the privilege, and that the employee does not enjoy attorney-client privilege. *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 339-340 (4th Cir. 2005).

was made on December 31, 2008.[2] On April 10, 2009, the Court denied Lomas' Motion to Set Aside Entry of Default.[3]

After numerous communications between opposing counsel, and a two-day delay, Lomas' deposition was finally noticed and held on February 19, 2009. At the deposition, Lomas refused to answer questions from Maxim's counsel, S&W. Lomas' counsel asserted that Lomas' previous conversations with S&W concerning events surrounding the collision with Cora French's vehicle were protected by the attorney-client privilege, and that Lomas held the privilege independently of Maxim. Nearly two months later, in response to Maxim's present Motion to Compel Responses to Deposition Questions, Lomas filed his present Motion to Remove Defense Counsel Due to Conflict of Interest.

## II.   Discussion

### A.   Plaintiff's Motion to Remove Defense Counsel Due to Conflict of Interest.

It is undisputed that S&W represented, and continues to represent, Maxim as its corporate counsel. Lomas seeks disqualification of S&W based on an alleged conflict of interest. At issue in this motion is whether S&W also represented Lomas during the

---

[2] Fed. R. Civ. P. 55(c), which states that a court "may set aside an entry of default for good cause," provides broad discretion to trial judges in determining what constitutes good cause. *See* William H. Danne, Jr., *What Constitutes "Good Cause" Allowing Federal Court to Relieve Party of his Default Under Rule 55(c) of Federal Rules of Civil Procedure,* 29 A.L.R. Fed. 7 § 2[a] (1976). Lomas' assertion that Maxim's indemnity counterclaim, for which default has been entered, is insufficient on its face is contradicted by Lomas' status as a joint tortfeasor (and named defendant) in the *French* litigation.

[3] The Court grants Maxim's request to strike all language in Lomas' Motion that addresses the merits of Maxim's counterclaim for which judgment has already been entered [p. 7, line 22 through p. 8, line 13; and p. 8, line 24 through p. 9, line 16].

4

*French* litigation proceedings. If so, S&W is bound by attorney-client privilege and has a conflict of interest in this litigation that must be resolved by waiver or removal.

Disqualification of counsel is a "drastic measure." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982). Courts are hesitant to disqualify opposing counsel "except when absolutely necessary." *Id.*; *Alexander v. Superior Court*, 141 Ariz. 157, 161, 685 P.2d 1309, 1313 (1984) ("only in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent"). Disqualification deprives a party of representation of their own choosing. *Id.* The moving party bears the burden to show sufficient reason for disqualification. *Id.* Attorneys in Arizona are bound by the Arizona Rules of Professional Conduct regarding conflicts of interest, which states:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

ER 1.9(a).

To demonstrate a conflict of interest, however, Lomas must prove the existence of an attorney-client relationship between Lomas and Maxim's counsel, S&W. The existence of an attorney-client relationship depends largely on a purported client's belief that it exists. *In re Pappas*, 159 Ariz. 516, 522, 768 P.2d 1161, 1167 (1998) (citations omitted). However, a person's belief must be objectively reasonable. *Paradigm Ins. Co. v. Langerman Law Offices. P.A.*, 200 Ariz. 146, 149, 24 P.3d 593, 596 (2001); *In re*

*Grand Jury Subpoena*, 415 F.3d at 339 ("An individual's subjective belief that he is represented is not alone sufficient to create an attorney-client relationship").

The attorney-client privilege exists to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. Courts have long recognized that the privilege applies when the client is a corporation. *U.S. v. Louisville & Nashville R. Co.*, 236 U.S. 318, 336 (1915). A corporation, however, is a fictional legal entity that acts through people, namely employees. Thus, in the corporate context, courts must decide which of those individuals' communications with a corporate attorney fall under the attorney-client privilege. *See* Timothy M. Middleton, *"Watered-Down Warnings": The Legal and Ethical Requirements of Corporate Attorneys in Providing Employees with "Upjohn Warnings" in Internal Investigations*, 21 Geo. J. Legal Ethics 951 (2008).

When corporate attorneys communicate with various employees of the corporation, the attorney-client privilege is maintained between counsel and the client-corporation. *Upjohn*, 449 U.S. at 386-396. In deciding whether an employee who communicates with a corporate attorney may assert the privilege independently, courts look to whether the employee reasonably believed that the attorney was representing the employee individually. *See In re Grand Jury Subpoena*, 415 F.3d at 339. When an employee knows that the corporate attorney does not represent him or her personally as a client, the privilege belongs to the corporation alone. *Id.* at 339-340. When an employee reasonably believes that the corporate attorney represents both the corporation and the

employee personally, the privilege applies to both the company and the individual employee. *See id.* at 339-341. *Upjohn* warnings are used to eliminate any potential confusion as to whom is being represented by corporate counsel.

In Lomas' Motion to Remove Defense Counsel (Doc. 33), Lomas alleges that Maxim's corporate counsel, S&W, met with him several times to discuss his testimony in the underlying *French* litigation, following Maxim's termination of Rogers as its corporate counsel. Lomas also points to the fact that when he testified in a subsequent deposition, S&W repeatedly asserted that portions of his testimony were protected by attorney-client privilege, and ordered him not to answer certain questions. Based on these assertions of privilege and his various discussions with S&W, Lomas argues that he reasonably believed that S&W attorneys were acting as his personal attorneys during the deposition. Lomas points to portions of the deposition transcript in which S&W attorney Jeffrey Willis instructed Lomas not to answer questions, opposing counsel referred to S&W attorneys as "your counsel," and Lomas similarly referred to S&W as "my counsel." Lomas also cites Judge Cornelio's ruling (Doc. 37-2) in his malpractice suit against Rogers, in which an attorney-client relationship was found to have been created between Lomas and Rogers, to support his assertion of an attorney-client relationship as to S&W as well. In addition, Lomas points to a letter from S&W attorney Jamie Ibrahim to Lomas' criminal defense attorney (Doc. 41-2) in which Ibrahim refers to Lomas being "represented" at the deposition in question by S&W. Maxim argues that Lomas has

failed to demonstrate that he had an objectively reasonable belief that defense counsel S&W personally represented him at any time.[4]

Upon review of the evidence submitted by both parties—including the transcript of the deposition in question, letters from S&W attorneys, court rulings in the related *French* and *Rogers* litigation, and evidence that S&W attorneys properly gave Lomas *Upjohn* warnings—Lomas has failed to demonstrate an objectively reasonable belief of personal representation by S&W. While he alternatively refers to S&W attorneys as "my attorneys" and "the attorneys" during his deposition, such statements on their own do not establish an objectively reasonable belief on Lomas' behalf that S&W personally represented him at the time of the deposition. Further, statements made by S&W attorneys in the same deposition undermine Lomas' assertion. Indeed, S&W attorney Willis explicitly announced the appearance of S&W attorneys "on behalf of Maxim Healthcare." Defs.' Response, Ex. N (Doc. 35-15). S&W attorney Willis also carefully delineated the boundaries of privilege claimed by Maxim when he instructed Lomas during the deposition in question:

> MR. WILLIS:   And, again, Mr. Lomas, to the extent that that answer would require you to reveal communications with lawyers representing Maxim, I instruct you not to answer. If there were communications that you had with persons who are not lawyers representing Maxim, then you're free to answer.

---

[4] Maxim also argues that prior court rulings establish that the issue of its own privilege with S&W has been previously litigated and resolved in its favor. On the basis of these rulings, Maxim argues, Lomas is collaterally estopped from asserting in the present motion that S&W has an attorney-client relationship with him. However, these earlier privilege rulings do not explicitly address the issue presently before the Court, i.e., whether an attorney-client relationship existed between Lomas and S&W. Rather, Judge Cornelio's ruling cited by Maxim concerns the existence of an attorney-client relationship between Lomas and Maxim's previous counsel, Rogers.

Pls. Supp., Ex. C (Doc. 41-4) at 133: 11-17. Even in S&W attorney Ibrahim's letter to Lomas' criminal defense counsel (Doc. 41-2), which Lomas cites as proof that S&W previously admitted that it represented him,  S&W is referred to simply as "Maxim's counsel." Lomas has further failed to produce any documentary evidence from which an attorney-client relationship between Lomas and S&W could be reasonably inferred.

Furthermore, Lomas' interactions with S&W are distinguishable from his relationship with Maxim's previous counsel, Rogers. In finding that Lomas had an objectively reasonable belief that Rogers was acting as his personal attorney, Judge Cornelio pointed to Rogers' failure to introduce evidence that she had expressly advised Lomas that she represented only Maxim in the *French* litigation. In stark contrast, here Maxim has produced evidence—Willis' letter to Lomas' attorney (Doc. 35-6) describing repeated warnings, and Willis' affidavit (Doc. 45-3)—that indicates that S&W appropriately gave Lomas numerous *Upjohn* warnings. Significantly, Lomas heeded those warnings and retained counsel. All three S&W attorneys expressly recall giving Lomas *Upjohn* warnings, and Maxim has also produced a letter from S&W attorney Elizabeth Peterson to Lomas in which she expressly urged Lomas to retain counsel. Defs. Ex. O (Doc. 35-16). Peterson's letter, dated December 27, 2006, stated that "we do not represent you personally, and only represent Maxim." Defs. Ex. O. Peterson urged Lomas to provide information to his insurance company "immediately to have counsel appointed by them to represent [his] interests." Defs. Ex. O.

Upon review of the evidence presented, the Court finds that Lomas has failed to demonstrate an objectively reasonable belief that S&W represented him personally. Lomas has failed to prove that S&W has a conflict of interest in this case, and Plaintiff's Motion to Remove Defense Counsel Due to Conflict of Interest is therefore **DENIED**.

### B.   Defendant's Motion to Compel Responses to Deposition Questions.

Also pending before the Court is Maxim's motion to compel Lomas to answer deposition questions, pursuant to Fed. R. Civ. P. 37(a)(3)(B)(i). Lomas had asserted that the attorney-client privilege between Lomas and S&W shielded him from questioning. However, at oral argument, after the Court ruled that no attorney-client relationship existed between S&W and Lomas, Lomas acknowledged that no legal basis existed for Lomas to decline to answer the questions propounded by Maxim. Defendant's Motion to Compel Responses to Deposition Questions is therefore **GRANTED**.[5]

### III.   <u>Conclusion</u>

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion to Remove Defense Counsel Due to Conflict of Interest (Doc. 33) in **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Compel Responses to Deposition Questions (Doc. 30) is **GRANTED**.

Dated this 21st day of July, 2009.

---

[5] The Court has been informed that the parties have reached a settlement. Therefore, unless either party moves for further consideration of attorney fees related to these motions, pursuant to Fed. R. Civ. P. 37, the Court considers that matter moot.

John M. Roll
Chief United States District Judge